## CASE NOS. 14-8047 & 14-8052

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

KELLY OSBORNE              )
                                           )

     Plaintiff—Appellant/cross appellee    )
                                           )

     v.                                       )
                                           )

BAXTER HEALTHCARE CORPORATION,  )
                                           )

DBA BIOLIFE PLASMA SERVICES, L.P.  )
                                           )

     Defendant—Appellee/cross appellant   )

_____

On Appeal from the United States District Court For the District of Wyoming
The Honorable Judge Scott W. Skavdahl Presiding
D.C. No. 2:13-CV-00139-SWS

_____

## APPELLANT'S OPENING BRIEF

_____

Respectfully submitted,
DALE A. GAAR
1600 Stout St., #1000
Denver, Colorado 80202
303-446-9300
gaar@qwest.net

STEPHEN H. KLINE
MELINDA S. MCCORKLE
Kline Law Office, PC
401 W. 19th Street, Suite 306
Cheyenne, WY 82001
Phone: 307-778-7056
Fax: 307-635-8106
skh@kline-wyolaw.com
msm@kline-wyolaw.com

## ORAL ARGUMENT IS REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

PRIOR OR RELATED APPEALS....................................................................vi

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE.................................................................2

STATEMENT OF THE FACTS ...............................................................4

    Baxter-BioLife and the Plasma Donation Process ..........................................4

    Kelly Osborne's Disability and Application for Employment.......................7

    Defendant's Conduct Regarding the Interactive Process and
    Identification of Reasonable Accommodations.............................................10

SUMMARY OF THE ARGUMENTS ....................................................13

THE COURT ERRED IN CONCLUDING AS A MATTER OF LAW
THAT THE JOB RESTRUCTURING MS. OSBORNE AND THE
PLASMA CENTER MANAGER PROPOSED WAS NOT A
REASONABLE ACCOMMODATION................................................................14

    Job restructuring may be a reasonable accommodation .................................15

    Ms. Osborne and the Plasma Center Manager agreed on job restructuring
    that did not constitute elimination of essential job functions, creation of a
    new position or changing defendant's business structure .............................16

    The reasonableness of the job restructuring accommodation involved
    genuine issues of material fact.......................................................................16

i

THE COURT ERRED BY FAILING TO CONSIDER THAT IN THE RUN OF CASES ENHANCED VISUAL OR VIBRATING MACHINE ALARMS ARE A REASONABLE ACCOMMODATION FOR PERSONS WHO ARE DEAF.................................................................................17

    Ms. Osborne demonstrated that, in the run of cases, adding enhanced visual or vibrating alarms to machinery is a reasonable accommodation for persons who are deaf.................................................................18

    Upon Ms. Osborne's showing of a reasonable accommodation in the run of cases, the burden shifted to defendant to establish why the accommodation was not reasonable in this case ...........................................20

    Because the defendant did not establish why enhanced visual or vibrating machine alarms were not reasonable in this case, summary judgment was not appropriate.......................................................................21

THE COURT ERRED IN CONCLUDING AS A MATTER OF LAW THAT MS. OSBORNE'S PROPOSED CALL BUTTON AND VIBRATING ALERT SYSTEM WAS UNREASONABLE BECAUSE IT WOULD NOT ELIMINATE A STATISTICALLY *DE MINIMUS* RESIDUAL SAFETY RISK TO DONORS.........................................................22

    Ms. Osborne presented expert opinion supporting the use of a donor call button system to help alert Ms. Osborne to a donor's need for assistance ...23

    Ms. Osborne offered evidence of the safety of the plasma donation process ........................................................................................................23

    The Court concluded that even a statistically *de minimus* residual safety risk to donors was unacceptable ....................................................................24

    The Court's ruling incorrectly resolved fact issues and misapplied the necessary direct threat analysis.......................................................................24

CONCLUSION .......................................................................................................27

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ................................27

CERTIFICATE OF COMPLIANCE.....................................................................29

ii

CERTIFICATE OF DIGITAL SUBMISSION ........................................................29

CERTIFICATE OF SERVICE .................................................................................30

ATTACHMENTS:

Osborne v. Baxter Healthcare Corp., 2:2013-CV-00139-SWS,

Order granting summary judgment on May 30, 2014 .....................................1

Docket entry of Judgment on June 5, 2014 ....................................................2

## TABLE OF AUTHORITIES

### CASES

*Bragdon v. Abbott*,
524 U.S. 624 (1998)....................................................................................25

*U.S. Airways, Inc. v. Barnett*,
535 U.S. 391(2002)............................................................................. 20, 21

*Anderson v. Coors Brewing Co.*,
181 F.3d 1171, 1177 (10th Cir. 1999) ......................................................15

*Colorado Cross-Disability Coal. v. Abercrombie & Fitch Co.*,
No. 13-1377, 2014 WL 4290589 (10th Cir. Aug. 29, 2014) ...................... 14, 17, 22

*Justice v. Crown Cork & Seal Co.*,
527 F.3d 1080, 1091 (10th Cir. 2008) .............................................. 26, 27

*Mason v. Avaya Comm., Inc.*,
357 F.3d 1114, 1122 (10th Cir. 2004) ......................................................20

*McKenzie v. Benton*,
388 F.3d 1342, 1354 (10th Cir. 2004) ......................................................26

*Metzler v. Fed. Home Loan Bank of Topeka*,
464 F.3d 1164, 1167 n.2 (10th Cir. 2006) …………………...……………14, 18, 22

*Rizzo v. Children's World Learning Centers, Inc.*,
84 F.3d 758, 764 (5th Cir. 1996)..............................................................25

*Smith v. Midland Brake, Inc.*,
180 F.3d 1154, 1178 (10th Cir. 1999)  …………………………………………15

*Smothers v. Solvay Chemicals, Inc.*,
740 F.3d 530, 533 (10th Cir. 2014) …………………...…......……….14, 18, 22

## STATUTES

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

42 U.S.C. § 12101 .................................................................................1

42 U.S.C. § 12111 ........................................................................... 15, 24

42 U.S.C. § 12112(a)……………………………………………………3

## REGULATIONS

29 C.F.R. § 1630.2(r) ...........................................................................25

## RULES

Federal Rules of Appellate Procedure, Rule 4…………………………..1

## OTHER AUTHORITIES

EEOC, *Appendix to Part 1630--Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. § 1630.2(0), available at* http://www.gpo.gov/fdsys/pkg/CFR-2013-title29-vol4/xml/CFR-2013-title29-vol4-part1630.xml    …………………………………………….…15

EEOC, *Questions and Answers about Deafness and Hearing Impairments in the Workplace and the Americans with Disabilities Act §9, available at* http://www.eeoc.gov/eeoc/publications/qa_deafness.cfm.....................................18

EEOC, *Questions and Answers about Health Care Workers and the Americans with Disabilities Act, available at* http://www.eeoc.gov/facts/health_care_workers.html .............................................19

Job Accommodation Network, Office of Disability Employment Policy of the U.S. Department of Labor, *available at* http://askjan.org/media/Hearing.html..…19

## PRIOR OR RELATED APPEALS

This matter involves the appeal by plaintiff Kelly Osborne in 14-8047 and the cross appeal by defendant Baxter Healthcare Corporation in 14-8052.

Plaintiff, Kelly Osborne, by undersigned counsel, respectfully submits the following opening brief.

## STATEMENT OF JURISDICTION

The United States District Court for the District of Wyoming had jurisdiction over this matter pursuant to 28 U.S.C. § 1331.  This action arose under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq.

The District Court order dismissing plaintiff's case on summary judgment was entered on the docket on June 5, 2014.   The notice of appeal by plaintiff was timely filed in accordance with Rule 4(a)(1)(A), F.R.A.P. on June 27, 2014.  Aplt. App. at 510.  The notice of cross-appeal was timely filed in accordance with Rule 4(a)(3), F.R.A.P. by defendant on July 10, 2014.  Aplt. App. at 513.  This appellate court's jurisdiction derives from 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Did the District Court err in concluding as a matter of law that the job restructuring Ms. Osborne and the plasma center manager proposed was not a reasonable accommodation?

II.   Did the District Court err by failing to consider that in the run of cases enhanced visual or vibrating machine alarms are a reasonable accommodation for persons who are deaf?

III.  Did the District Court err in concluding as a matter of law that Ms. Osborne's proposed call button and vibrating alert system was unreasonable because it would not eliminate a statistically *de minimus* residual safety risk to donors?

## STATEMENT OF THE CASE

Kelly Osborne[1] is totally deaf.  She lost her hearing at age 19.  She lip reads and speaks very well.  She applied for a position as a plasma center technician ("PCT") at defendant Baxter-BioLife's[2] plasma center in Cheyenne, Wyoming. She was interviewed by the Cheyenne plasma center manager, Joe Elder, and other

---

[1] At the time of the events that gave rise to this case, plaintiff's name was Kelly Layne. She has since married and her name is now Kelly Osborne.

[2] BioLife Plasma Services, L.P. is wholly owned by Baxter Healthcare Corp. The plasma center involved in this case operated with the name BioLife. The corporate HR representatives involved were employees of Baxter. For clarity, the defendant is referred to as Baxter-Biolife.

supervisory staff at the center.  Mr. Elder knew that Kelly Osborne was deaf, but believed she had good communication skills which would allow her to perform the job.  Mr. Elder verbally offered Ms. Osborne a job as a PCT and anticipated that she would work primarily, not exclusively, in the plasma processing area of the center.

After receiving the job offer, Ms. Osborne completed a health questionnaire in which she again disclosed that she is deaf. The plasma center nurse in Cheyenne forwarded the health questionnaire to corporate headquarters near Chicago. Without having any further interaction with Ms. Osborne, the corporate human resources staff decided that Ms. Osborne could not perform the essential functions of the job as a PCT because she could not hear audible alarms on the machines used to obtain plasma from donors.  Baxter-BioLife withdrew Ms. Osborne's job offer without considering the reasonable accommodations that would allow Ms. Osborne to perform the essential functions of the PCT job.

Ms. Osborne filed this action against Baxter-BioLife and asserted a single claim for employment discrimination in violation of title I of the Americans with Disabilities Act, 42 U.S.C. § 12112(a)("ADA").  Defendant filed its motion for summary judgment contending that as a matter of law Ms. Osborne was not qualified for the PCT job because her deafness prevented her from hearing audible alarms and vocalizations by plasma donors who may need assistance.

3

The District Court granted summary judgment and dismissed plaintiff's claims because it found as a matter of law that plaintiff failed to establish that her proposed accommodations were reasonable.

## STATEMENT OF THE FACTS

### *Baxter-BioLife and the Plasma Donation Process*

BioLife is a subsidiary of Baxter Healthcare International. Baxter-BioLife purchases plasma donations, processes the product and sells the plasma internationally.  Aplt. App. at 88.  The BioLife plasma center in Cheyenne was staffed by PCTs, senior PCTs, master PCTs, a medical supervisor/RN, a center manager, a quality manager, one or two assistant managers, and a training supervisor. Aplt. App. at 288-289.  There were approximately thirty PCTs at the Cheyenne center in 2008. Aplt. App. at 316.

PCTs performed three general functions: (i) assisting in the medical history area where donors completed an electronic donor questionnaire at a computer terminal; (ii) working in the area where donors gave plasma; or (iii) working in the sample preparation area where donated plasma was processed and stored.  Aplt. App. at 289.  When the Baxter-BioLife Cheyenne plasma center opened, staff was hired as medical historians, phlebotomists or sample preparation technicians. In early 2008, Baxter-BioLife's corporate office merged those three positions into the PCT job. Employees who had been working exclusively as historians,

4

phlebotomists or sample preparation technicians were given until the end of 2009 to train for the other duties that PCTs could perform.  Aplt. App. at 323-324.  The company made this job classification change to improve advancement opportunities for staff and decrease the high rate of employee attrition.  Aplt. App. at 351-352.  By the end of 2010, the company reconsidered this restructuring and again created a separate sample processing position.  Aplt. App. at 334-335.

PCTs who worked in the plasma collection area would set up plasma collection materials for each donor, including a collection bag, anticoagulant and saline solution. They also carried the plasma that had been donated to the sample preparation area. Aplt. App. at 294-295.  Only a senior PCT was allowed to perform the venipuncture required to draw the whole blood containing plasma from donors.  Aplt. App. at 291.   FDA regulations require at least one PCT for every six donors. Aplt. App. at 290.  The PCTs, however, jointly share responsibility for all the donors rather than being assigned to specific donors.  *Id*.

During the plasma collection process, a plasmapheresis machine is used to separate plasma from other blood components. The machine collects the plasma and returns the other blood components to the donor. The machine also provides the donor with saline solution to replace the liquid plasma that has been harvested. Aplt. App. at 294.  The plasmapheresis machines are highly automated. Each machine is set to collect a predetermined amount of plasma. When that amount of

plasma has been collected, the machine stops the collection process and signals the technicians to advance to the next stage. Aplt. App. at 357-359.  In the event the plasmapheresis machine detects an error in the process, it provides an alarm that persists until a technician resets the machine.  Aplt. App. at 296-297.  In the event it detects a serious error, the plasmapheresis machine will provide an alarm and stop the process.  Aplt. App. at 309-310.  When the plasmapheresis machine provides an alert or alarm, it always generates both an audible tone and a warning light.  Aplt. App. at 303.

According to Baxter-BioLife, "donating plasma is a low risk procedure with minimal or no side effects."  Aplt. App. at 343, 371, 387. Significant donor reactions were extremely rare at the Cheyenne plasma center. The Cheyenne center manager, Joe Elder, worked for Baxter-BioLife for approximately four and a half years. He estimated that the Cheyenne center processed 40,000 to 45,000 donations per year. He thought there were around four or five donor reactions per year for which Baxter-BioLife suggested donors seek any type of follow-up care.  Aplt. App. at 298-299.  The four to five reactions per year were not emergency situations requiring an ambulance; rather, they resulted in suggestions for additional treatment. *Id.*  Baxter-BioLife asserts that its significant donor reaction rate over the last three years has been 700 out of "millions" of donors.  Aplt. App. at 395. This reaction rate is less than .0004.  Defendant's expert Dr. Troughton identified

seven specific donor reactions in the last three years. Five of those required a

BioLife nurse to administer Epinephrine to a donor and arrange for transport to a

hospital. The other two involved falls by donors who became dizzy. *Id.*

In the event of a serious donor reaction, a PCT must get help from more

senior employees such as a senior PCT, a master PCT or a registered nurse. Aplt.

App. at 291, 292, 295, 368.  As the defendant's 30(b)(6) witness testified:

> Q. Is it fair to say that for an entry level plasma center technician,
> their job is to notice the problem and get help in the event of a donor
> reaction?
> A. That's fair.

Aplt. App. at 333.  Donors can receive an important income stream by regularly

giving plasma. The typical BioLife donor gives plasma 36 to 45 times per year.

Aplt. App. at 385.

### *Kelly Osborne's Disability and Application for Employment*

Kelly Osborne is deaf. Aplt. App. at 400.  Defendant knew Ms. Osborne is

deaf.  Aplt. App. at 307, 330, 331.  Ms. Osborne applied for a job as a PCT with

BioLife on August 21, 2008.  Aplt. App. at 406.  Ms. Osborne had a number of

qualifications for the PCT position for which she applied at Baxter-BioLife. She

had previously taken a course and obtained a phlebotomy certificate in Texas.

Aplt. App. at 399.  She had experience communicating with donors and obtaining

DNA swabs for Specimen Specialists, Inc. in Wyoming.  Aplt. App. at 402.  She

previously worked in the laboratory of a plasma center in Texas where she

processed plasma and paid plasma donors.  Aplt. App. at 398. Defendant agrees that apart from issues arising from her deafness, Kelly Osborne was qualified for the PCT position.  Aplt. App. at 330-331.

Ms. Osborne interviewed for the PCT job with plasma center manager, Joe Elder. Aplt. App. at 300.  Mr. Elder offered Ms. Osborne the position of PCT, conditioned on her satisfactory completion of a background check, drug test and health screening. Aplt. App. at 301.  Because Ms. Osborne is deaf, Mr. Elder decided to restructure the PCT job duties to have her work primarily, although not exclusively, in the sample processing area. Aplt. App. at 302.  Mr. Elder determined the Cheyenne center could work around any obstacles that came up due to Ms. Osborne's deafness.  Aplt. App. at 306.  Mr. Elder described his ideas about job restructuring in his deposition:

> I believe -- as I recall, they were concerns that we, as a management team, had.  That -- that we thought at that time might be overcome by concentrating primarily in the sample prep area.  However, she would still have to be out in the phlebotomy area as a PCT and would -- would have to put sets on, you know, would have to take bags off, and so on -- bottles off.  So she was going to be in a situation where she's going to be monitoring donor safety.  Everyone was going to be in that situation.

Aplt. App. at 303-304.  In August and September of 2008 there were other employees working for Baxter-Biolife who worked primarily in the sample processing area.  Aplt. App. at 323.

Mr. Elder was impressed with Ms. Osborne's speech reading and speaking

skills. He believed that she had sufficient communication abilities to perform the

PCT job:

> A. Was I aware of her lip-reading? Yes, I was aware of that. I would
> say I was impressed with her ability to communicate.
> Q. Part of what you would need to do before you decided to hire
> someone was to assure yourself they could communicate effectively
> in the workplace, right?
> A. Certainly.
> Q. And you felt that Kelly could communicate effectively in the
> workplace?
> A. Uh-huh. I felt she could communicate effectively in the workplace,
> yes.

Aplt. App. at 307-308.

On August 22, 2008 Baxter-BioLife sent Ms. Osborne written confirmation

of her conditional offer of employment and confirmed her September 8, 2008 start

date. Aplt. App. at 414, 417.  The next day, August 23, 2008, Ms. Osborne

submitted a Baseline Health History Screening Questionnaire to BioLife in which

she again disclosed that she is deaf. Aplt. App. at 421-428.  The RN in Cheyenne

who reviewed the Baseline Health Questionnaire contacted the defendant's

corporate office on August 26th to seek guidance about hiring Ms. Osborne. Aplt.

App. at 332.  On September 8th when Ms. Osborne reported for her first day of

work, center manager Joe Elder informed her that her job offer was being

withdrawn. Mr. Elder described the decision to withdraw the job offer:

Q.      It strikes me that you were ready to hire her and make this job work for her, if she was capable, and that the folks at the corporate level said no, we're not going to do it.
A. You could describe it that way, yes.
Q. I mean, would that be accurate?
A. Yeah. For the most part, it would be accurate, yeah. I mean, it would be accurate.

Aplt. App. at 304-305.

Baxter-BioLife withdrew the job offer to Kelly Osborne because she was deaf. The company had two concerns: (i) that she was unable to hear the alarms on plasmapheresis machines, and (ii) that donors wouldn't be able to verbally get her attention when her back was turned to them.  Aplt. App. at 329-330, 421.

### *Defendant's Conduct Regarding the Interactive Process and Identification of Reasonable Accommodations.*

Between the time Kelly Osborne submitted her Baseline Health Questionnaire on August 23, 2008 and withdrawal of the offer on September 8, 2008, Sherrie Stevenson and Nancy Engelmann at the Baxter/BioLife corporate office discussed among themselves whether to withdraw the job offer.  Aplt. App. at 324-325.  The defendant knew that Ms. Osborne was seeking reasonable accommodation so she could work. Aplt. App. at 334.  Ms. Stevenson and Ms. Engelmann discussed whether Ms. Osborne could see the alarm lights on the plasmapheresis machines but did not discuss how she might be accommodated. Aplt. App. at 327.

10

The defendant's own policy and practice is to solicit input from the individual with the disability when evaluating reasonable accommodations. Aplt. App. at 369-371.  Baxter-BioLife's internal policies provided that the "[t]he disability accommodation process is interactive and requires cooperation and communication between the individual requesting accommodation and the individual responding to the request." Aplt. App. at 336, 438.  Baxter-BioLife did not contact Ms. Osborne to discuss reasonable accommodation during the critical period between the time she submitted the health questionnaire and the time her job offer was withdrawn. Aplt. App. at 335, 442.   Ms. Stevenson, who was involved in the decision to withdraw the job offer, never spoke to Ms. Osborne. She did not even know if Ms. Osborne could speak clearly. Aplt. App. at 367.  Ms. Stevenson also believed that, if hired, Ms. Osborne would independently be responsible for six donors.  Aplt. App. at 363.  This understanding was inconsistent with the actual practice in the Cheyenne plasma center where all the plasma center technicians shared the responsibility for donors.  Aplt. App. at 290.

Defendant did not consider any potential reasonable accommodations for a deaf employee. Defendant did not consider vibrating alert systems or hospital type call buttons. Aplt. App. at326.  Baxter/BioLife never considered enhancing the existing alarm lights on the plasma machines with strobes. Aplt. App. at 362. The

company could have initiated a request to the machine manufacturer for such a modification but did not. Aplt. App. at 362.

Because Baxter/BioLife never identified a reasonable accommodation for Ms. Osborne, it never reached the point of analyzing whether providing a reasonable accommodation would be an undue hardship for the company. Aplt. App. at 337-338. Baxter-BioLife did not consider its financial resources in evaluating reasonable accommodations for Ms. Osborne. The company did not consider the availability of funding from the Wyoming Division of Vocational Rehabilitation. Baxter-BioLife did not have a policy or procedure regarding the amount it could spend providing accommodations to persons with disabilities. Aplt. App. at 341-342. Vocational Rehabilitation can provide services including adaptive equipment and training to allow a deaf employee to effectively communicate in the work place. Aplt. App. at 445-447. Before withdrawing Ms. Osborne's conditional offer of employment, Defendant engaged in no analysis of whether Ms. Osborne would pose a direct threat to others if she worked as a PCT. Aplt. App. at 322.

## SUMMARY OF THE ARGUMENTS

The Court erred in rejecting as a matter of law three of the accommodations that Ms. Osborne identified:   (1) job restructuring; (2) enhanced alerts on the plasmpheresis machines that would add strobe lights or vibrating alerts to attract Ms. Osborne's attention, and; (3) plasma donor call buttons to alert Ms. Osborne visually when a donor needed assistance.

There were genuine issues of material fact about whether the job restructuring accommodation the plasma center manager proposed would have reassigned essential functions, created a new position or changed defendant's business structure.

With regard to the enhanced machine alerts, the court failed to recognize that the plaintiff's showing that this was a reasonable accommodation in the run of cases shifted the burden to defendant to establish why the accommodation was not feasible in this case.  Defendant failed to offer such proof and summary judgment was inappropriate.

The court incorrectly evaluated the safety issues associated with the proposed donor call button accommodation.  The court erroneously concluded that if even a statistically *de minimus* threat to donors remained after an accommodation, the accommodation was unreasonable.  The safety issue was a fact question that should not have been decided on summary judgment.

13

# ARGUMENT

## THE COURT ERRED IN CONCLUDING AS A MATTER OF LAW THAT THE JOB RESTRUCTURING MS. OSBORNE AND THE PLASMA CENTER MANAGER PROPOSED WAS NOT A REASONABLE ACCOMMODATION

The court's summary judgment on the issue of job restructuring as a reasonable accommodation is subject to a *de novo* standard of review. *Colorado-Cross Disability Coal. v. Abercrombie & Fitch Co.*, No. 13-1377, 2014 WL 4290589 (10th Cir. Aug. 29, 2014). Job restructuring as a reasonable accommodation was raised in Plaintiff's Brief in Opposition to Summary Judgment. Aplt. App. at 276. The Court decided the issue in its May 30, 2014 oral ruling. Aplt. App. at 499-501.

Because this case arises from an appeal of summary judgment, the Court must review "the evidence, and draw reasonable inferences therefrom, in the light most favorable to" Ms. Osborne as the non-moving party. *Smothers v. Solvay Chemicals, Inc.,* 740 F.3d 530, 533 (10th Cir. 2014) (citing *Metzler v. Fed. Home Loan Bank of Topeka,* 464 F.3d 1164, 1167 n.2 (10th Cir. 2006)).

Defendant advertised job openings for Plasma Center Technicians. After Ms. Osborne interviewed with Cheyenne plasma center manager Joe Elder and other supervisory staff, Mr. Elder offered her the Plasma Center Technician job. Because Ms. Osborne was deaf, Mr. Elder proposed an informal job restructuring. He anticipated that she would work primarily in the sample preparation area.

14

However she would still work in the phlebotomy area and would be monitoring

donor safety.  Aplt. App. at 94.  Having met and spoken with Ms. Osborne, Mr.

Elder believed that she had adequate communication skills to perform the PCT

position in the Cheyenne center.  Aplt. App. at 95-96.

### Job Restructuring may be a Reasonable Accommodation

The ADA specifically lists job restructuring as an example of a reasonable

accommodation. 42 U.S.C.A. § 12111(9)(b).  Although the ADA does not define

"job restructuring", the EEOC provided guidance on the meaning of the term.

EEOC, *Appendix to Part 1630--Interpretive Guidance on Title I of the Americans*

*with Disabilities Act*, *29 C.F.R. § 1630.2(0), available at*

http://www.gpo.gov/fdsys/pkg/CFR-2013-title29-vol4/xml/CFR-2013-title29-vol4-

part1630.xml.  The EEOC notes that an employer may be required to restructure a

job by reallocating or redistributing nonessential, marginal job functions.  This

Court has noted that some "job restructuring" may be required, but substantial

modification of essential job requirements is not a reasonable accommodation.

*Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1178 (10th Cir.

1999).  An employer is not required to provide an accommodation that

fundamentally alters a job, creates a new position or changes the structure of its

business. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1177 (10th Cir. 1999).

15

### *Ms. Osborne and the Plasma Center Manager Agreed on Job Restructuring that did not Constitute Elimination of Essential Job Functions, Creation of a New Position or Changing Defendant's Business Structure*

Ms. Osborne and Mr. Elder, the Cheyenne plasma center manager, discussed job restructuring of the plasma center technician position for Ms. Osborne so that she would work primarily, but not exclusively, in the sample processing area. As Mr. Elder testified in his deposition, Ms. Osborne would have continued to work at times directly with donors and would have retained responsibility for donor monitoring. There were other PCTs already performing the duties that Ms. Osborne would have performed under Mr. Elder's planned accommodation. No new position would have been created, essential job functions would not have been eliminated and defendant's business structure would not have been changed. Aplt. App. at 95-96. Mr. Elder's proposed job restructuring would have simply allowed Ms. Osborne to spend more time performing those duties for which she had the strongest abilities.

### *The Reasonableness of the Job Restructuring Accommodation Involved Genuine Issues of Material Fact*

After Mr. Elder met and interviewed Ms. Osborne, he believed that she could perform the PCT position and proposed what he thought would be a reasonable accommodation that would allow her to work primarily in the areas where she had the strongest skills. Without ever meeting or speaking with Ms. Osborne, representatives of defendant's corporate office disagreed with Mr.

16

Elder's initial assessment of her qualifications as a deaf person to perform the job. This disagreement between the center manager and the corporate office regarding whether Ms. Osborne could perform the essential functions of the job created genuine issues of material fact.

A jury should have been allowed to resolve the factual issues about:

(1) whether Mr. Elder or defendant's H.R. representatives more accurately assessed Ms. Osborne's communication skills;

(2) whether reducing the percentage of time Ms. Osborne spent monitoring donors and increasing the percentage of time she spent processing samples constituted elimination of the donor monitoring job function, and;

(3) whether Mr. Elder's proposed assignment of work changed defendant's business structure.

**THE COURT ERRED BY FAILING TO CONSIDER THAT IN THE RUN OF CASES ENHANCED VISUAL OR VIBRATING MACHINE ALARMS ARE A REASONABLE ACCOMMODATION FOR PERSONS WHO ARE DEAF**

The court's summary judgment on the issue of enhanced visual or vibrating machine alarms as a reasonable accommodation is subject to a *de novo* standard of review.  *Colorado Cross-Disability Coal. v. Abercrombie & Fitch Co.*, No. 13-1377, 2014 WL 4290589 (10th Cir. Aug. 29, 2014).  The issue of enhanced visual or vibrating machine alarms as a reasonable accommodation was raised in

17

Plaintiff's Brief in Opposition to Summary Judgment.  Aplt. App. 277.  The Court

decided the issue in its May 30, 2014 oral ruling.  Aplt. App. at 501-502.

Because this case arises from an appeal of summary judgment, the Court

must review "the evidence, and draw reasonable inferences therefrom, in the light

most favorable to" Ms. Osborne as the non-moving party. *Smothers v. Solvay*

*Chemicals, Inc.,* 740 F.3d 530, 533 (10th Cir. 2014) (citing *Metzler v. Fed. Home*

*Loan Bank of Topeka,* 464 F.3d 1164, 1167 n.2 (10th Cir. 2006)).

### *Ms. Osborne Demonstrated that, in the Run of Cases, Adding Enhanced Visual or Vibrating Alarms to Machinery is a Reasonable Accommodation for Persons who are Deaf*

Ms. Osborne showed that in the run of cases, persons who are deaf may be

provided with reasonable accommodation by adding strobes or vibrating alarms to

equipment with audible alarms.  This showing was based on the text of the ADA

itself which identifies acquisition or modification of equipment or devices as an

example of a reasonable accommodation.  42 U.S.C. § 12111(9)(b).  In addition,

the EEOC described this type of accommodation in its publication about

employment of persons with hearing impairments.  EEOC, *Questions and Answers*

*about Deafness and Hearing Impairments in the Workplace and the Americans*

*with Disabilities Act* §9, *available at*

http://www.eeoc.gov/eeoc/publications/qa_deafness.cfm.  The EEOC notes that

one type of reasonable accommodation for a deaf employee is use of appropriate

emergency notification systems such as strobe lighting or vibrating pagers.

Similarly, the EEOC states that reasonable accommodations for persons with

disabilities working in health care settings include "[a]cquiring or modifying

equipment or devices."  EEOC, *Questions and Answers about Health Care*

*Workers and the Americans with Disabilities Act*, *available at*

http://www.eeoc.gov/facts/health_care_workers.html.

The Job Accommodation Network (JAN) is a service of the Office of

Disability Employment Policy of the U.S. Department of Labor. JAN provides the

following guidance about providing reasonable accommodations to persons who

have difficulty responding to sounds in the environment:

- Use a visual or vibrating alerting device
  Note: Alerting devices are used to alert people to a broad range
  of sounds, including (but not limited to) abnormal machine
  sounds, timers, a telephone ringing, doorbell, baby crying, and
  emergency signals.
- Modify equipment by adding a light to the sound source
  Note: Speak with the manufacturer of the equipment for
  suggestions before making modifications and consult with an
  electrician, or appropriate professional.
- Install lighted fire strobes and other visual or vibrating alerting
  devices to supplement audible alarms
- Provide a vibrating text pager that may be triggered by the
  emergency alerting system or establish a web-based text alert
  system

http://askjan.org/media/Hearing.html. Plaintiff's adaptive technology expert noted

numerous examples of individuals with disabilities successfully employed in health

care with simple technical interventions including vibrating pagers, vibrating

phones, and beacon flashers.  Aplt. App. at 453-454.  Finally, Ms. Osborne offered evidence that there was a process by which defendant could request the addition of enhanced alert systems to its plasmapheresis machines.  Aplt. App. at 362.  When she presented the above information to the court, plaintiff met her burden of showing that, in the run of cases, enhanced lights or vibrating alarm modifications to defendant's equipment would be a reasonable accommodation for an employee who is deaf.

### Upon Ms. Osborne's Showing of a Reasonable Accommodation in the Run of Cases, the Burden Shifted to Defendant to Establish why the Accommodation was not Reasonable in this Case

In the context of a summary judgment motion, the employee must first demonstrate that an accommodation appears "reasonable on its face." *Mason v. Avaya Comm., Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004).  The burden of production then shifts to the employer to present evidence of its inability to accommodate. *Id.* "If the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." *Id.* The Supreme Court discussed this process in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002):

> [A] plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an "accommodation" seems reasonable on its face, i.e., ordinarily or in the run of cases…. Once the plaintiff has made this showing, the defendant/employer then must show

special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.

*Id*. (internal citations omitted).

### *Because the Defendant did not Establish why Enhanced Visual or Vibrating Machine Alarms Were not Reasonable in This Case, Summary Judgment was not Appropriate*

In this case, Ms. Osborne showed that adding enhanced lights and vibrating alarms on defendant's plasmapheresis machines was reasonable on its face, i.e., ordinarily or in the run of cases. This showing shifted the burden to defendant to show why enhanced alarms would be an undue hardship. Defendant simply did not respond with any showing why enhanced machine alarms were not a reasonable accommodation. Since Ms. Osborne had demonstrated that the proposed accommodations were reasonable of their face and Baxter-Biolife failed to meet its burden of showing any evidence of undue hardship, the court erred in granting summary judgment to defendant.

The court altogether misapplied the shifting burden of proof on this issue. In the court's order, it stated that the plaintiff had failed to show the cost, time to complete or feasibility of enhancing the alarms on defendant's plasmapheresis machines. Aplt. App. at 502. This approach by the court is inconsistent with the Supreme Court's ruling in *U.S. Airways, Inc. v. Barnett* that plaintiff need only show that an accommodation seems reasonable on its face, i.e., ordinarily or in the run of cases. Plaintiff need not make a further case specific showing until the

21

defendant comes forward with specific evidence of undue hardship. Here, Baxter-Biolife did not present such evidence and the court erred in granting defendant's summary judgment motion.

**THE COURT ERRED IN CONCLUDING AS A MATTER OF LAW THAT MS. OSBORNE'S PROPOSED CALL BUTTON AND VIBRATING ALERT SYSTEM WAS UNREASONABLE BECAUSE IT WOULD NOT ELIMINATE A STATISTICALLY *DE MINIMUS* RESIDUAL SAFETY RISK TO DONORS**

The court's summary judgment on the issue of a call button and vibrating alert system as a reasonable accommodation is subject to a *de novo* standard of review. *Colorado Cross-Disability Coal. v. Abercrombie & Fitch Co.*, No. 13-1377, 2014 WL 4290589 (10th Cir. Aug. 29, 2014). The issue of a call button and vibrating alert system as a reasonable accommodation was raised in Plaintiff's Brief in Opposition to Summary Judgment. Aplt. App. at 277. The Court decided the issue in its May 30, 2014 oral ruling. Aplt. App. at 502-503.

Because this case arises from an appeal of summary judgment, the Court must review "the evidence, and draw reasonable inferences therefrom, in the light most favorable to" Ms. Osborne as the non-moving party. *Smothers v. Solvay Chemicals, Inc.,* 740 F.3d 530, 533 (10th Cir. 2014) (citing *Metzler v. Fed. Home Loan Bank of Topeka,* 464 F.3d 1164, 1167 n.2 (10th Cir. 2006)).

### *Ms. Osborne Presented Expert Opinion Supporting the use of a Donor call Button System to Help Alert Ms. Osborne to a Donor's Need for Assistance*

Kelly Osborne is skilled in lip reading and an effective communicator if she is aware that someone is speaking to her.  Aplt. App. at 307-308.  If her back was turned to a plasma donor, a paging or call button system would provide a way for a donor to attract her attention.  Such a system would be similar to call buttons provided to hospital patients with which they can call for a nurse.  Joe Schaffner is a Casper, Wyoming expert in adaptive technology for persons with disabilities. His expert opinion is that donors could have been provided with a wireless call button system that would visually alert Ms. Osborne that a donor needed her attention. Aplt. App. at 454.

### *Ms. Osborne Offered Evidence of the Safety of the Plasma Donation Process*

There was also evidence in the record about the safety of the plasma donation process and the likelihood of significant adverse donor reactions. According to Baxter-BioLife, "donating plasma is a low risk procedure with minimal or no side effects." Aplt. App. at 343, 371, 387.  Baxter-BioLife asserts that its significant donor reaction rate over the last three years has been 700 out of "millions" of donors. This reaction rate is less than .0004.  Aplt. App. at 395.

### *The Court Concluded That Even a Statistically De Minimus Residual Safety Risk to Donors was Unacceptable*

In discussing the proposed call button system accommodation, the court remained concerned that all safety risks would not be eliminated by the system. The court described the potential risks to donors as "statistical [sic] *de minimis*" but unacceptable.  Aplt. App. at 503.

### *The Court's Ruling Incorrectly Resolved Fact Issues and Misapplied the Necessary Direct Threat Analysis*

Essentially, the court ruled that Ms. Osborne was a direct threat to donors because she can't hear and that providing donors with a call button system to get Ms. Osborne's attention when the donor needed assistance would not eliminate the direct threat.  The ADA defines "direct threat" as "a *significant* risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  42 U.S.C. § 12111(3)(emphasis added).

The EEOC regulations implementing the ADA provide guidance on how to determine if an applicant or employee poses a direct threat:

> Direct Threat means a *significant* risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include: (1) The duration of the risk; (2) The

24

nature and severity of the potential harm; (3) The *likelihood* that the potential harm will occur; and (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r) (emphasis added).

The Supreme Court discussed a direct threat analysis in *Bragdon v. Abbott*, 524 U.S. 624 (1998) which was a case under title III of the ADA. *Bragdon* involved a dentist's refusal to treat an HIV positive patient due to concern about HIV transmission. The Supreme Court began its direct threat discussion in *Bragdon* by noting that "because few, if any, activities in life are risk free" the question is not "whether a risk exists, but whether it is significant." *Id.* at 649. In the present case, the court found that even a statistically *de minimus* risk to plasma donors made the call button accommodation unreasonable. In reaching this conclusion the court ignored the requirement that a direct threat finding must be based on the likelihood and significance of the risk.

The donor safety issue should not have been resolved on summary judgment. The Fifth Circuit addressed a direct threat issue in an ADA employment case in *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 764 (5th Cir. 1996):

> [w]hether one is a direct threat is a complicated, fact intensive determination, not a question of law. To determine whether a particular individual performing a particular act poses a direct risk to others is a matter for the trier of fact to determine after weighing all of the evidence about the nature of the risk and the potential harm.

25

The *Rizzo* court concluded that it was a question of fact for the jury whether a hearing impaired school bus driver who may not be able to hear a child choking in the back of the bus posed a direct threat to her passengers.

The burden of proving that an employee is a direct threat typically falls on the employer. However, "where the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that [he] can perform those functions without endangering others." *Justice v. Crown Cork & Seal Co*., 527 F.3d 1080, 1091 (10th Cir. 2008)(citing *McKenzie v. Benton*, 388 F.3d 1342, 1354 (10th Cir. 2004)).

Regardless of which party in the present case had the burden of proof on the safety/direct threat issue, it presented questions of fact that should have been decided by the jury. This Court discussed proof of safety and direct threat in *Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080, 1091-92 (10th Cir. 2008) and applied the same analysis regardless of the party who had the burden of proof on the safety/direct threat issue. *Crown Cork* involved an electrician at a manufacturing plant who had balance problems following a stroke. The electrician acknowledged that the position of electrician in the plant could be "deadly" and that "lives are at stake." Despite plaintiff's concession of the severity of the risks in the plant, this Court concluded that an issue of material fact existed as to whether the plaintiff actually posed a direct threat to plant safety.

26

> Applying the factors set forth in 29 C.F.R. § 1630.2(r), while the risk of harm may have been permanent and the severity of the harm great, a reasonable jury could conclude that the likelihood of the harm was extremely small and that [plaintiff] therefore did not pose a "direct threat" to the safety of himself or others.

*Id.* at 1092.

The court in the present case erred when it concluded on summary judgment that the proposed call button accommodation was unreasonable as a matter of law because it did not eliminate a statistically *de minimus* risk to plasma donors.

## CONCLUSION

The order granting summary judgment should be reversed, and the case remanded to the district court for a jury trial.

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

The factual background of this case and the application of those facts to the federal law at issue are complex in nature, and it is appropriate and necessary to have the opportunity to clarify the issues presented.  Therefore, the Appellant requests oral argument and respectfully requests that both sides be given a total of one-half hour.

Respectfully submitted,

By: /s/ Dale A. Gaar
DALE A. GAAR (digital)
1600 Stout St., #1000
Denver, Colorado 80202
(303) 446-9300
gaar@qwest.net

By: /s/ Melinda S. McCorkle
Stephen H. Kline
Melinda S. McCorkle (digital)
Kline Law Office, PC
First Interstate Bank Building
401 W. 19th Street, Suite 306
Cheyenne, WY 82001
Phone: 307-778-7056
Fax: 307-635-8106
skh@kline-wyolaw.com
msm@kline-wyolaw.com

**Certificate of Compliance**

**Section 1.    Word count**

As required by Fed. R. App. P. 32(a)(7)(c), I certify that this brief is proportionally spaced and contains 6,249 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

X        I relied on my word processor to obtain the count and it is Word Version 2010.

À        I counted five characters per word, counting all characters including citations and numerals.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 size font in Times New Roman.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

By:  /s/ Dale A. Gaar
Dale A. Gaar (Digital)

**CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS**

I hereby certify that a copy of the foregoing **APPELLANT'S OPENING BRIEF**, as submitted in Digital Form via the court's ECF systLem, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with the most recent version of Norton Internet Security by Symantec and, according to the program, is free of viruses. In addition, I certify all required privacy redactions have been made.

By: /s/ Dale A. Gaar
DALE A. GAAR (Digital)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **APPELLANT'S OPENING BRIEF** was furnished through (ECF) electronic service to the following on this 6th day of October, 2014:

Bradley T. Cave
Brynn A. Hvidston
Joanna R. Villow
Holland & Hart
2515 Warren Ave., Suite 450
Cheyenne, WY 82003-1347

/s/ Dale A. Gaar
Dale A. Gaar (Digital)

1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF WYOMING
   -------------------------------------------------------------
3   KELLY OSBORNE,

4              Plaintiff,            Case No. 13-CV-139-S
                                     Casper, Wyoming
5       v.                          May 30, 2014
                                     10:03 a.m.
6   BAXTER HEALTHCARE CORP.,
    d/b/a BIOLIFE PLASMA SERVICES,
7
                   Defendant.
8   -------------------------------------------------------------

9                    TRANSCRIPT OF HEARING PROCEEDINGS
                               ORAL RULING
10
                 BEFORE THE HONORABLE SCOTT W. SKAVDAHL
11                    UNITED STATES DISTRICT JUDGE

12  APPEARANCES (TELECONFERENCE):

13  For the Plaintiff:        MR. STEPHEN H. KLINE
                              MS. MELINDA MCCORKLE
14                            Attorneys at Law
                              Kline Law Office, PC
15                            401 West 19th Street, Ste. 306
                              Cheyenne, Wyoming 82001
16
                              MR. DALE GAAR
17                            Attorney at Law
                              1600 Stout Street, Ste. 100
18                            Denver, Colorado  80202

19  For the Defendant:        MR. BRADLEY T. CAVE
                              Attorney at Law
20                            Holland and Hart, LLP
                              2515 Warren Avenue, Ste. 450
21                            Cheyenne, Wyoming 82001

22  Court Reporter:           MERRILYN WALZ, RPR
                              3560 Gannett Street
23                            Casper, Wyoming  82609
                              (307)265-0543
24                            mwalzreporting@hotmail.com

25  Proceedings recorded by digital stenography, transcript
    produced with computer.

                              ATTACHMENT 1

13-CV-139                     ORAL RULING                          2

1              P R O C E E D I N G S

2         (Proceedings commenced 10:03 a.m., May 30, 2014, in

3    chambers in the presence of the Court.  Counsel

4    participating by teleconference:  Mr. Gaar, Mr. Kline, Ms.

5    McCorkle and Mr. Cave.  Also present:  William Elliott,

6    Tiffany Dyer.)

7              THE COURT:  Court is in session in the matter of

8    Kelly Osborne, plaintiff, versus Baxter Healthcare Corp.,

9    doing business as BioLife Plasma Services, Case Number

10   13-CV-139.

11             I note the presence of plaintiff's counsel,

12   Mr. Gaar and Mr. Kline and Ms. McCorkle, and the presence of

13   counsel for defendant, Mr. Cave.

14             The matter is before the Court on defendant's

15   motion for summary judgment.

16             The Court has reviewed the materials, briefing, and

17   further reviewed additional materials following the oral

18   argument of counsel.

19             The standard of review in these matters is well

20   established under Rule of Civil Procedure 56(a), summary

21   judgment is warranted if there are no genuine issues of

22   material fact and the moving party is entitled to judgment

23   as a matter of law.

24             The Court is required to view the evidence and make

25   all reasonable inferences in the favor of the nonmoving

13-CV-139                    ORAL RULING                          3

1    party.  The moving party holds both the initial burden of
2    production and the burden of establishing that summary
3    judgment is appropriate as a matter of law.

4          If the moving party carries its initial burden, the
5    burden then shifts to the nonmoving party to identify
6    specific facts showing a genuine dispute for trial.  The
7    nonmoving party cannot rest on pleadings.

8          The undisputed facts in this case establish that
9    Plaintiff Kelly Osborne has been deaf since the age of 19.
10   She communicates primarily through lip reading.  And she is
11   trained and experienced as a phlebotomist.

12         Defendant Baxter Healthcare does business in
13   Wyoming as BioLife Plasma Services.  BioLife collects plasma
14   from donors which has various uses in the medical industry.

15         In August of 2008, Ms. Osborne applied to work at
16   BioLife in Cheyenne, Wyoming, as a plasma center technician.

17         As established by the pleadings and record in this
18   matter, prior to 2008, BioLife had positions of medical
19   historian, phlebotomist and sample prep technician in its
20   plasma centers.  However, in 2007, BioLife engaged in a
21   process to create a job family progression that combined the
22   duties of the former positions of medical historian,
23   phlebotomist and sample prep technician into a single
24   position called a plasma center technician.

25         After January of 2008, all new-entry level

```
13-CV-139                    ORAL RULING                         4
```

1   employees hired by BioLife in Cheyenne were PCT's or plasma
2   center technicians.  No center was authorized to create
3   sample preparation technician positions or hire individuals
4   into that position.

5        I would note, subsequent to that, in 2009, after
6   the facts giving rise to this lawsuit occurred, BioLife did
7   in some circumstances reinstitute positions for sample prep
8   technicians, but that was not at the time of the events
9   giving rise to the claims in this suit as noted.

10       PCT's perform three primary functions:  They assist
11  with the taking of a donor's medical history, which is done
12  at a computer terminal; they monitor the area where donors
13  give plasma for any adverse reactions; and they work in the
14  sample preparation area where donated plasma is processed
15  and stored.

16       Ms. Osborne was interviewed by the then manager of
17  BioLife in Cheyenne, Joe Elder.  She had at least one more
18  interview with additional BioLife supervisory staff after
19  that.  At both interviews she made clear that she was deaf
20  and communicated primarily through lip reading.

21       Mr. Elder verbally offered Ms. Osborne a PCT job
22  and followed that with a formal written offer.  He intended
23  to have her work primarily, but not exclusively, in the
24  sample preparation area or lab area.

25       Ms. Osborne satisfied the prerequisites for the PCT

13-CV-139                        ORAL RULING                              5

1  position, including passing a background check, a drug test

2  and a medical screening.  She was to start work for BioLife

3  on September 8, 2008.

4          Between the time that she was offered the PCT job

5  by Mr. Elder and her scheduled start date, her information

6  was forwarded to BioLife's corporate human resources

7  department, which is near Chicago, Illinois.

8          Corporate human resources determined that, because

9  she could not hear the audible alarms emitted by the

10 plasmapheresis machines which occurred when something needed

11 attention or had gone wrong, she could not safely monitor

12 the donor area of the Cheyenne facility.

13         Corporate human resources thus determined she could

14 not perform all essential functions of the PCT position.

15         Consequently, Ms. Osborne arrived for her scheduled

16 first day of work on September 8, 2008, and Mr. Elder was

17 forced to inform her that BioLife had rescinded the job

18 offer.

19         Ms. Osborne then filed this lawsuit alleging

20 BioLife violated the Americans with Disabilities Act by

21 rescinding her employment offer.  BioLife seeks summary

22 judgment on the claim.

23         BioLife asserts that Ms. Osborne could not perform

24 the essential functions of a plasma center technician due to

25 her deafness without -- with or without reasonable

13-CV-139                    ORAL RULING                         6

1    accommodation.

2           Ms. Osborne contends multiple reasonable

3    accommodations exist that would have allowed her to work as

4    a PCT employee in the Cheyenne facility.

5           The analysis engaged in by this Court requires to

6    establish a prima facie case of discrimination under the

7    ADA, an employee must show, one, that she is disabled within

8    the meaning of the ADA; two, she is qualified with or

9    without reasonable accommodation to perform the essential

10   functions of the job held or desired; and three, she was

11   discriminated against because of her disability.  See Mason

12   versus Avaya Communications, Inc., 357 F.3d 1114 at 1118,

13   Tenth Circuit 2004.

14          The first element, whether Ms. Osborne is disabled

15   under the ADA, here BioLife concedes Ms. Osborne, as a

16   result of her deafness, is disabled under the ADA.

17          Therefore, the Court proceeds to the second

18   element, which is whether Ms. Osborne can perform the

19   essential job functions.

20          The second element requires a two-step analysis.

21   First, this Court must determine whether the individual can

22   perform the essential functions of the job; second, if, but

23   only if, the Court concludes that the individual is unable

24   to perform the essential functions of the job, the Court

25   then determines whether any reasonable accommodation by the

13-CV-139                    ORAL RULING                        7

1   employer would enable her to perform those functions.

2            See Mason 357 F.3d at 1118.  The plaintiff bears

3   the burden of showing she is able to perform the essential

4   functions of the job.

5            Concerning the first step of the two-step analysis,

6   the parties agree the essential functions of the PCT

7   position include monitoring the donor area for any adverse

8   reactions to the plasmapheresis process.

9            This is supported by Exhibit F to BioLife's motion

10  for summary judgment, which is the position description for

11  the PCT position in Cheyenne.

12            Among the job duties listed is "monitor donors

13  during donation process and respond to donor reaction."  See

14  document 32-7.

15            This is also supported by the Food and Drug

16  Administration's requirement that every six donors be

17  monitored by at least one employee for adverse reactions,

18  which Joe Elder testified to in his deposition.

19            Additionally, the parties agree that Ms. Osborne

20  cannot perform this essential function of the PCT job

21  without accommodation.  This is supported by the position

22  description which says "the ability to hear equipment sounds

23  from a distance is required."  See document 32-7.

24            Accordingly, the Court moves to the second step of

25  the two-step analysis, whether any reasonable accommodation

```
13-CV-139                    ORAL RULING                        8
```

1  would enable Ms. Osborne to perform this essential function

2  of the PCT position.

3          To defeat an employer's motion for summary

4  judgment, the employee must first demonstrate that an

5  accommodation appears reasonable on its face.  The burden of

6  production then shifts to the employer to present evidence

7  of its inability to accommodate.  If the employer presents

8  such evidence, the employee has the burden of coming forward

9  with evidence concerning her individual capabilities and

10  suggestions for possible accommodations to rebut the

11  employer's evidence.  See Mason 357 at 1122.

12          Ms. Osborne asserts there are four reasonable

13  accommodations that would permit her to perform the

14  essential functions of a PCT.  One would be job

15  restructuring; two would be enhanced alert lights on the

16  plasmapheresis machines; third would be paging or call

17  button systems for the donors; and the fourth would be a

18  hearing oral interpreter.

19          The Court will address each of these proposed

20  accommodations in turn.

21          First, with respect to job restructuring, Ms.

22  Osborne first contends her PCT position could be

23  restructured as Joe Elder first proposed by assigning her to

24  work primarily in the sample processing area or lab.

25          BioLife argues that Mr. Elder's proposal, which

13-CV-139                      ORAL RULING                             9

1   BioLife corporate office struck down, went above and beyond
2   what the ADA requires.

3           BioLife is correct.  Ms. Osborne's request to work
4   exclusively or primarily in the lab area fundamentally
5   alters the nature of the PCT position at the time by
6   removing or reducing Ms. Osborne's duty to monitor donors
7   and, in turn, increasing the other PCTs' duty to monitor
8   donors.

9           This also does not work well with the FDA
10  requirements, which would require that at least one PCT
11  monitor be available for no more than six donors.

12          The Tenth Circuit has made clear that, under the
13  ADA, employers are under no obligation to change the
14  structure of its business or create new positions.  See
15  Anderson versus Coors Brewing, 181 F.3d 1171 at 1177, citing
16  Milton versus Scrivner, 53 F.3d 1118 at 1124 and 25, Tenth
17  Circuit 1995.

18          In Mason, the Tenth Circuit noted that, "We have
19  consistently held, however, that an employee's request to be
20  relieved from an essential function of her position is not,
21  as a matter of law, a reasonable or even plausible
22  accommodation.  In fact, the ADA does not even require an
23  employer to modify an essential function of an existing
24  position in order to accommodate a disabled employee."
25          That's Mason, 357 F.3d at 1122 and 23, and several

13-CV-139                        ORAL RULING                          10

1   supporting cases cited therein.

2            Nor is an employer required to force its other

3   employees to perform the essential functions the plaintiff

4   is unable to perform.  See Coors Brewing, 181 F.3d at 1177

5   and Mason, 357 F.3d at 1123.

6            Ms. Osborne's request to work exclusively or

7   primarily in the lab area and Joe Elder's similar proposal

8   is an accommodation BioLife is not legally obligated to

9   meet.  It goes beyond what the ADA requires under the case

10  law and, consequently, it is not a reasonable accommodation

11  as a matter of law.

12           The second accommodation regarding enhanced alert

13  lights on the plasmapheresis machines, Ms. Osborne next

14  proffered this accommodation is to enhance the plasma -- let

15  me restate that.

16           Ms. Osborne's next proffered accommodation is to

17  enhance the plasmapheresis machines with strobe lights or a

18  vibrating feature that would get her attention even if she

19  was facing away from the machine or donor.

20           Ms. Osborne has not demonstrated this accommodation

21  is reasonable, though.  The only information she provides is

22  a citation to the deposition of Sherrie Stevenson, a person

23  largely unidentifiable to the Court based upon the minimal

24  portions of her deposition that were provided.  See document

25  33-7, Exhibit 6 of Plaintiff's Response to Motion for

```
13-CV-139                    ORAL RULING                          11
```

1  Summary Judgment.

2        The portion of Ms. Stevenson's deposition
3  concerning modifying the plasmapheresis machines does not
4  suggest such modification is reasonable.  She states the
5  plasmapheresis machine is a 510(k) medical device which we
6  don't have the ability to modify, close quote.

7        When questioned further, she stated modification is
8  a lengthy process that must be done through the vendor who
9  supplies the machines.

10        Ms. Osborne provided no evidence to suggest the
11  reasonableness of this proposed accommodation, such as
12  monetary costs or time required or even whether a strobe
13  light or vibrating feature was a feasible modification.

14        Consequently, Ms. Osborne has not carried her
15  burden of showing that modifying the plasmapheresis machine
16  with strobe lights or a vibrating feature is a reasonable
17  accommodation.

18        Accommodation 3, paging or call button system for
19  donors.  Ms. Osborne's third suggested accommodation was to
20  provide the donors with a paging or call button that they
21  could activate which would attract her attention in a manner
22  similar to call buttons in hospitals.

23        While such a system would help donors get her
24  attention, it would not ensure that she could safely monitor
25  the donors for adverse reactions to the plasmapheresis

13-CV-139                    ORAL RULING                    12

1   procedure.

2          Mr. Elder, the former manager of BioLife in

3   Cheyenne, testified in his deposition that some adverse

4   reactions can cause a donor to lose consciousness, become

5   less and less alert or morph into kind of a seizing type of

6   confusion.  See Elder depo at pages 94 through 95.

7          It goes without saying that it's not reasonable to

8   place the onus of monitoring on the donor who is passed out

9   or becomes confused from the adverse reaction to the

10   plasmapheresis process, nor is the statistical de minimis

11   potential, does this Court believe, sufficient to show that

12   it would be a reasonable accommodation under the facts and

13   circumstances.

14          Consequently, Ms. Osborne has not carried her

15   burden of showing that a paging or call button system for

16   plasma donors is a reasonable accommodation.

17          The fourth accommodation proffered was a hearing

18   oral interpreter.  Ms. Osborne's final proposed

19   accommodation was to pair her with a hearing person who

20   would accompany her throughout her time monitoring donors

21   and alert her to audible warnings or donor statements.

22          The courts of appeal have consistently held that

23   employers are not required to assign existing employees or

24   hire new employees to perform certain functions or duties of

25   a disabled employee's job that the disabled employee cannot

13-CV-139                    ORAL RULING                     13

1  perform.

2          See Bratten versus SSI Services, Inc., 185 F.3d 625

3  at 632 through 33, Sixth Circuit 1999; Moritz, M-o-r-i-t-z,

4  versus Frontier Airlines, Inc., 147 F.3d 784 at 788, 1998

5  Eighth Circuit decision; Cochrum versus Old Ben Coal

6  Company, 102 F.3d 908 at 913, 1996 Seventh Circuit decision.

7          The Tenth Circuit has not expressly addressed this

8  issue in a published opinion, but it has held in at least

9  two unpublished opinions that an employer is not required

10  under the ADA to have another employee assist a disabled

11  employee in order to enable that employee to perform his or

12  her job essential functions.

13          See Merrell versus ICEE-USA Corp., 242 F.3d 389,

14  Tenth Circuit 2000 decision; and Deal, D-e-a-l, versus

15  Candid Color Systems, 153 F.3d 726, a Tenth Circuit 1998

16  decision.

17          And in another case, the Tenth Circuit affirmed

18  summary judgment for the reasons set forth by the district

19  court which said that the hiring of a, quote, helper, close

20  quote, to assist the disabled person to perform the

21  essential functions of their job was unreasonable as a

22  matter of law.  See Ricks versus Xerox Corp., 877 F. Supp

23  1468 at 1477, affirmed by the Tenth Circuit at 96 F.3d 1453.

24          In light of these circuit court decisions and

25  principles of law, the Court finds Ms. Osborne has not shown

13-CV-139                    ORAL RULING                        14

1    that assigning a hearing person to accompany her while

2    monitoring donors is a reasonable accommodation on its face.

3          It's unreasonable because it requires employing a

4    second person to allow Ms. Osborne to fulfill the essential

5    duties of the PCT position.

6          BioLife's -- addressing BioLife alleged failure to

7    engage in the interactive process, Ms. Osborne's claim that

8    BioLife wrongly failed to participate in the interactive

9    process before deciding it could not employ her as a PCT

10   fails to state a cause of action.

11         In Smith versus Midland Brake, Incorporated, 180

12   F.3d 1154 at 1174, the Tenth Circuit held or made clear that

13   a claimant cannot recover on such a claim unless he can also

14   show that a reasonable accommodation was possible.

15         Here, Ms. Osborne has not shown that a reasonable

16   accommodation existed and, consequently, she cannot prevail

17   on her claim that BioLife wrongly failed to participate in

18   the interactive process.

19         Ms. Osborne has not carried her burden of showing

20   she can perform the essential functions of the PCT job with

21   or without reasonable accommodation.  Consequently, she has

22   not established the second element of a prima facie case of

23   discrimination under the ADA.  And summary judgment in the

24   defendant's favor is required.

25         After reading through the depositions of Ms.

13-CV-139                    ORAL RULING                         15

1   Osborne and Mr. Elder, it is clear to see why Mr. Elder

2   sought to hire her to work at BioLife.  It's clear that Ms.

3   Osborne has a great deal of character and personality.

4          In addition, the Court finds it awkward that the

5   corporate office in a different state essentially overrode

6   the local store manager's hiring decision here.  Such

7   practice would seem to encourage legal problems, not solve

8   them.

9          Nonetheless, the ADA does not and did not require

10  under these facts and circumstances, and given the

11  undisputed facts, the employment of Ms. Osborne, under the

12  facts and circumstances.

13         And while granting summary judgment to BioLife in

14  some ways is not palatable, the ADA's purpose is not to

15  punish the company for its local manager's attempt to try to

16  make it work by exceeding the law's requirement.

17         Accordingly, BioLife's motion for summary judgment

18  is hereby granted.  And each party is to bear their own fees

19  and costs regarding this matter.

20         I will direct that a minute order be entered

21  incorporating therein, by reference, this Court's oral

22  ruling which has been transcribed in this matter -- or has

23  been taken down.

24         Without addressing the merits of the Court's

25  ruling, are there any other matters or issues we need to

13-CV-139                    ORAL RULING                    16

1   address, Mr. Gaar or Mr. Kline or Ms. McCorkle?

2              MR. GAAR:   Not for the plaintiff, Your Honor.

3              THE COURT:   And Mr. Cave?

4              MR. CAVE:   Nothing from the defendants, Your

5   Honor.

6              THE COURT:   All right.   Very well.   Thank you,

7   Counsel, for your excellent briefing and arguments in this

8   matter.

9              I will issue the minute order and incorporate

10  therein the Court's oral ruling.

11             Have a great weekend.

12       (Proceedings concluded 10:25 a.m., May 30, 2014.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Appellate Case: 14-8052    Document: 01019321593    Date Filed: 10/06/2014    Page: 54
Case 2:13-cv-00139-SWS   Document 41   Filed 06/09/14   Page 17 of 17

17

1                                C E R T I F I C A T E

2

3          I, Merrilyn Walz, a Registered Professional Reporter,

4     do hereby certify that I reported by machine shorthand the

5     foregoing proceedings contained herein on the aforementioned

6     subject on the date herein set forth, and that the foregoing

7     pages constitute a full, true and correct transcript.

8          Dated this 9th day of June, 2014.

9

10                             /s/ Merrilyn Walz

11                             _____

12                                   Merrilyn Walz
                                 Registered Professional Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# United States District Court

———————— For The District of Wyoming ————————

KELLY OSBORNE,
      Plaintiff,

      v.

Case No. 13CV139-S

BAXTER HEALTHCARE
CORPORATION,

      Defendant.

## **JUDGMENT IN A CIVIL CASE**

This action came before the Court on Defendant's [31] Motion for Summary

Judgment. The Court having heard the arguments of counsel, having reviewed the

Motion, and being otherwise fully advised in the premises, issued an Order on

5/30/2014 pursuant to the Oral Ruling GRANTING the Defendant's Motion.

    Judgment is hereby entered in favor of the Defendant and this matter is dismissed,

each party to bear their own costs and attorney fees.

————————————————          ————————————————

Date 6/5/2014          STEPHAN HARRIS
                          CLERK OF COURT

                          (By) Deputy Clerk

ATTACHMENT 2